**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RUBEN SANDIA,**

                              **1:14-cv-377**
                    **Plaintiff,**        **(GLS/ATB)**

          **v.**

**WAL-MART STORES, EAST LP,**

                    **Defendant.**
_____
**APPEARANCES:**                **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Ruben Sandia
Pro Se
1611 Carrie Street
Schenectady, NY 12308

**FOR THE DEFENDANT:**
Nixon, Peabody Law Firm          JOSEPH J. ORTEGO, ESQ.
50 Jericho Quadrangle            JUAN L. GARCIA, ESQ.
Suite 300
Jericho, NY 11753

**Gary L. Sharpe**
**Senior District Judge**

## <u>MEMORANDUM-DECISION AND ORDER</u>

### I. <u>Introduction</u>

     Plaintiff Ruben Sandia commenced this action against defendant

Wal-Mart Stores, East LP pursuant to Title VII of the Civil Rights Act of

1964,[1] seeking damages for employment discrimination on the basis of race and national origin as well as retaliation and hostile work environment. (Am. Compl., Dkt. No. 6.)  Pending before the court is Wal-Mart's motion for summary judgment.  (Dkt. No. 43.)  For the reasons that follow, the motion is granted.

## II.  Background[2]

### A.  Facts

Ruben Sandia is a Guyanese citizen of Indian descent who self-identifies as Asian.[3]  (Def.'s Statement of Material Facts (SMF) ¶ 1, Dkt. No. 43, Attach. 1.)  From March 2007 until his April 2013 termination, Sandia worked as an associate at Wal-Mart in Glenville, New York.  (*Id.* ¶ 3.)  Sandia was hired to work in the deli department at a pay rate of $8.30 per hour.  (*Id.* ¶ 9; Dkt. No. 43, Attach. 11.)  Sandia's wife, Renie Sandia who is also Guyanese, worked as an associate in the produce

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] Unless otherwise noted, the facts are not in dispute.

[3] Notably, Sandia failed to properly respond to Wal-Mart's statement of material facts "by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" as required by the Local Rules of Practice.  *See* N.D.N.Y. L.R. 7.1(a)(3).  Where properly supported, the facts asserted by Wal-Mart in its statement of material facts are deemed admitted pursuant to Local Rule 7.1(a)(3).

department of the same Wal-Mart.  (Def.'s SMF ¶ 4; Dkt. No. 43, Attach. 6 at 17-18.)

Sandia claims that, at some point, he was transferred from the deli department to the seafood department where he worked alone.  (Dkt. No. 43, Attach. 6 at 21-22.)  In July 2009, Sandia was transferred to the meat department because, according to Sandia, the seafood department had closed.  (*Id.* at 24.)  As a sales associate in the meat department Sandia continued to perform some tasks related to the seafood area.  (*Id.* at 25.)  He alleges that Wal-Mart cut his pay when he was transferred to the meat department, however, Sandia could not recall what his pay rate was as a seafood sales associate.  (Dkt. No. 43, Attach. 6 at 24-31.)  Sandia earned $9.20 per hour in the meat department, which increased to $11.00 per hour at the time of his termination.  (Def.'s SMF ¶¶ 10-11.)

When Sandia applied for a position at Wal-Mart in 2007, he filled out an application form that indicated he was available to work any shift, any day of the week.  (Dkt. No. 43, Attach. 10 at 2; Dkt. No. 43, Attach. 6 at 74-75.)  Subsequently, in April 2008, he filled out a "Customer Service Scheduling Availability Associate" form indicating that he was available to work from noon to eleven in the evening, Wednesday through Sunday.

3

(Dkt. No. 43, Attach. 22 at 3; Dkt. No. 43, Attach. 6 at 76-77; Def.'s SMF ¶ 37.)  Sandia modified his availability in September 2008 to only work until nine in the evening, but now seven days a week.  (Dkt. No. 43, Attach. 22 at 4; Dkt. No. 43, Attach. 6 at 77; Def.'s SMF ¶ 38.)  In December 2009, Sandia again changed his availability and requested a day shift on Tuesdays from eight in the morning to five in the evening as well as Wednesdays and Thursdays off.  (Dkt. No. 43, Attach. 22 at 6; Dkt. No. 43, Attach. 6 at 77-78; Def.'s SMF ¶¶ 39-40.)  Wal-Mart granted Sandia's request to work the day shift on Tuesdays.  (Dkt. No. 43, Attach. 6 at 78; Def.'s SMF ¶ 40.)  Sandia testified that his supervisors "never agree[d] to g[i]ve [him] the day shift when [he] ask[ed] for it," and "new people [were] coming and [assigned] a day shift."  (Dkt. No. 43, Attach. 6 at 79.)

Anthony Gaio supervised the associates in the meat department.  (*Id.* ¶ 10.)  Sandia testified that he was the only black associate within that department.  (Dkt. No. 43, Attach. 6 at 67.)  Sandia is of the belief that other associates either reported him to managers or would not talk with him because of his race.  (*Id.* at 64-67, 143.)

During his employment at Wal-Mart, Sandia received performance

evaluations.  (Def.'s SMF ¶¶ 18, 20-21, 23, 26-28; Dkt. No. 43, Attachs. 12-15, 17, 19, 21.)  In both his 2007 and 2008 reviews, supervisors reported that Sandia needed to improve rotating the inventory, handling customer complaints and requests, and managing his time.  (Dkt. No. 43, Attachs. 12-13.)  Again, in 2009, supervisors reported that Sandia needed to better manage his time while stocking seafood.  (Dkt. No. 43, Attach. 14 at 3.)  In 2010, supervisors wrote that Sandia needed to improve his customer relations skills and this same critique was noted again in his 2013 evaluation.  (Dkt. No. 43, Attach. 15; Dkt. No. 43, Attach. 21 at 4.)  In 2011, Sandia's supervisors remarked that he needed to be more familiar with Wal-Mart's product line, however, the evaluation was otherwise positive.  (Dkt. No. 43, Attach. 17 at 3.)  Finally, in both his 2012 and 2013 evaluations, supervisors noted that Sandia could improve by better exercising his judgment and focus on himself rather than the work of other associates.  (Dkt. No. 43, Attach. 19 at 3; Dkt. No. 43, Attach. 21 at 3.)  When presented with the 2007, 2009, and 2010 performance evaluations at his deposition, Sandia contested his supervisor's assessments.  (Dkt. No. 43, Attach. 6 at 33-34, 38, 42.)

Sandia also has past misconduct reports in his employee file.  (Def's

SMF ¶ 17.)  Wal-Mart has a "Coaching for Improvement Policy" to address employee misconduct and discipline.  (*Id.* ¶ 16; Dkt. No. 43, Attach. 9.)  A manager or supervisor may issue "coachings" to employees for misconduct, which remain active for a year in an employee's file.  (Def.'s SMF ¶ 16.)  To support its motion, Wal-Mart submitted three coachings that were issued to Sandia during his employment, in 2010, 2011, and 2013, respectively.  (Dkt. No. 43, Attachs. 16, 18, 20.)  In 2010, Sandia received a coaching for taking an extended break.  (Def.'s SMF ¶ 25; Dkt. No. 43, Attach. 16.)  In 2011, Sandia was issued a coaching for insubordination for wearing a wool hat in violation of Wal-Mart's employee dress code.  (Def.'s SMF ¶ 34; Dkt. No. 43, Attach. 18.)  Finally, in 2013, Sandia received a coaching for being argumentative with managers while on the sales floor.  (Def.'s SMF ¶ 35; Dkt. No. 43, Attach. 20.)

Many of Sandia's allegations arise from an event that occurred in March 2012.  Sandia testified that his supervisor, Gaio, humiliated him in front of other associates.  (Dkt. No. 43, Attach. 6 at 89-93.)  Specifically, Sandia claimed that Gaio sent another associate to bring him into the back room where Gaio stood with approximately five or six associates and told Sandia to pick up cardboard boxes that were on the floor.  (*Id.* at 89-90.)

Sandia responded that the boxes were not his responsibility because they were blue, and the boxes he was discarding were brown.  (*Id.* at 90-91.) Sandia explained that all of the associates laughed at him and mocked him while he picked up the boxes from the ground.  (*Id.* at 91.)  The next day, Sandia complained to Kirk Christian, the store manager, about the incident explaining that Gaio humiliated him, but he did not know why.  (*Id.* at 92.) Sandia also complained to Matt Branson, a marketing manager, and Rebecca Amado, the regional human resource director who visited the store to investigate the complaint after Sandia reported the incident by calling the company's hotline.  (*Id.* at 93-96.)

After he reported the incident, Sandia testified that Gaio retaliated against him five times.  (*Id.* at 98-109.)  Sandia stated that Gaio issued him three coachings in retaliation for reporting the March 2012 incident.  (Dkt. No. 43, Attach. 6 at 94, 98-108.)  First, Sandia explained that Gaio issued him a coaching for wearing a wool cap on the sales floor while he was finishing up work that required that he be in the meat freezer.  (*Id.* at 98-101.)  As noted above, according to Wal-Mart's records, this coaching was actually issued in February 2011.  (Dkt. No. 43, Attach. 18.)  Next, Sandia stated that Gaio issued him another coaching after an associate took a

picture of empty shelves where Sandia was supposed to have stocked meat. (*Id.* at 105-06.) Finally, Sandia complained that Gaio issued him a coaching for not responding to his call that a customer needed assistance while Sandia was apparently at lunch.[4] (*Id.* at 106-07.) According to Sandia, Christian, the store manager, later eliminated the coachings about the wool cap and empty shelves from his file. (*Id.* at 58, 108.) Sandia also testified that Gaio denied his request for assistance from another associate to help clean up the meat department at closing time and that Gaio inquired about whether Sandia liked his job. (*Id.* at 102-05, 108-09.) Sandia admitted that his pay, position, and duties remained the same after he reported the March 2012 incident. (*Id.* at 109-10.)

In addition, on the errata sheet to his deposition transcript, Sandia recalled additional purported retaliatory conduct. First, he overheard white associates who were husband and wife state that Gaio allowed them to work in the same department and have the same shift, lunch break, and days off. (Dkt. No. 43, Attach. 6 at 143.) Sandia told them that Gaio did not do this for he and his wife. (*Id.*) In response, according to Sandia, the

---

[4] Wal-Mart has not presented documentary evidence of coachings that Sandia claims to have received for failing to stock the shelves in the meat department or failing to aid a customer.

couple reported him to Gaio and Gaio issued him a coaching.[5]  (*Id.*)

Sandia also stated that other associates reported him to Gaio for

misconduct including pushing a meat cart out of his way, purportedly

putting a box of raw meat on the wrong shelf, and throwing out spoiled

seafood.  (*Id.*)

On April 13, 2013, Sandia was terminated for insubordination.  (Dkt.

No. 43, Attach. 23; Def.'s SMF ¶ 41.)  The parties dispute the facts which

led to Sandia's termination.  According to Wal-Mart's exit interview, Sandia

failed to report to the manager's office after his name was called on the

store intercom.  (Dkt. No. 43, Attach. 23 at 2.)  Store managers and

supervisors including Gaio called Sandia to explain why he missed

punching in his time to account for his break.  (*Id.*)  Once summoned,

Sandia refused to meet, began to argue with the managers, and accused

Gaio of favoritism.  (*Id.* at 4.)  Additionally, Sandia demanded that his wife

be terminated.  (*Id.*)  Sandia, on the other hand, contends that he was in

the meat cooler when his name was called over the intercom and could not

hear it.  (Dkt. No. 43, Attach. 6 at 82-83.)  He acknowledges that he raised

his voice when he spoke to the managers and that he asked for his wife to

---

[5] Again, Wal-Mart has not submitted documentary evidence of this coaching.

be terminated over him because he would have to drive her to work as she did not have a license.  (*Id.* at 84-85.)

After his termination, Sandia timely filed a complaint with the New York State Division of Human Rights (DHR) alleging unlawful discrimination and retaliation.  (Dkt. No. 43, Attach. 24.)  DHR later dismissed the complaint finding that the evidence did not support that Sandia's termination gave rise to unlawful discrimination or retaliation and issued a right to sue letter.  (Dkt. No. 6, Attach. 1.)  Thereafter, on April 4, 2014, Sandia commenced this action against Wal-Mart.  (*See generally* Compl., Dkt. No. 1.)

## III.  Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV.  Discussion

## A.  Employment Discrimination

Wal-Mart argues that it is entitled to summary judgment on Sandia's

Title VII claim because he does not present sufficient evidence to support a prima facie case of discrimination.  (Dkt. No. 43, Attach. 2 at 10.)  In particular, Wal-Mart contends that Sandia's speculation that he was terminated because of unlawful discrimination cannot defeat summary judgment.  (*Id.* at 12.)  Furthermore, Wal-Mart asserts that Sandia's allegations regarding failure to promote or reduction of wages has no basis in the record.  (*Id.* at 14-17.)  Finally, Wal-Mart maintains that the other conduct that Sandia complains of is not adverse action warranting relief under Title VII.  (*Id.* at 17-19.)

In response, Sandia claims that Wal-Mart wrongfully terminated him because he was later deemed eligible for unemployment benefits by the New York State Department of Labor as it found that his actions on the day of his termination did not amount to misconduct.  (Dkt. No. 45 at 2, 4; Dkt. No. 47.)  Sandia also contests that he should not have been terminated because he had generally positive performance evaluations and he was not insubordinate, Wal-Mart's basis for his termination.  (Dkt. No. 45 at 2-3.)  Finally, Sandia "strongly belie[ves] that [he] was terminated because of [his r]ace and [n]ational origin."  (*Id.* at 2.)

It is unlawful for an employer "to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).  To evaluate claims of race or national origin discrimination, "courts apply the burden-shifting rules first set forth in *McDonnell Douglas Corp. v. Green*, [411 U.S. 792 (1973)], which place upon the plaintiff the initial burden of making out a prima facie case of discrimination."  *Hunter v. Cty. of Albany,* 834 F. Supp. 2d 86, 92 (N.D.N.Y. 2011).  The plaintiff must demonstrate: "(1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) the ultimate filling of the position with an individual who is not a member of the protected class."  *Id.* (internal quotation marks and citations omitted).  "The fourth prong may be satisfied by demonstrating that the discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination based on the plaintiff's membership in a protected class."  *Id.* (internal quotation marks and citation omitted).

If the plaintiff meets his initial burden, it raises a presumption of unlawful discrimination, which the defendant must counter with a legitimate, nondiscriminatory reason for the adverse employment action.

*See id.* (internal quotation marks and citation omitted). The defendant's

proffer of such reason will eliminate the presumption of discrimination, "and

the defendant 'will be entitled to summary judgment . . . unless the plaintiff

can point to evidence that reasonably supports a finding of prohibited

discrimination.'" *Id.* (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149,

154 (2d Cir. 2000)). For that reason, "[t]he plaintiff must demonstrate by a

preponderance of the evidence that 'the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination.'"

*Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253

(1981)). The plaintiff need not prove "'that the employer's proffered

reasons were false or played no role in the employment decision, but only

that they were not the only reasons and that the prohibited factor was at

least one of the motivating factors.'" *Id.* (quoting *Holcomb v. Iona Coll.*,

521 F.3d 130 138 (2d Cir. 2008)).

Here, Sandia cannot even meet the minimal burden to state a prima

facie case. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 80 (2d Cir.

2005). Aside from his conclusory allegations, which are never sufficient to

defeat a summary judgment motion, *Wagner*, 827 F. Supp. 2d at 92,

Sandia presents no evidence that his termination or Wal-Mart's other

13

purported adverse action were motivated by discrimination on the basis of his race or national origin. Instead, Sandia claims that Wal-Mart's discrimination against him is its wrongful termination of him for insubordination. (Dkt. No. 45 at 2.) To demonstrate that he was not insubordinate Sandia points to the New York State Department of Labor's decision that he was eligible for unemployment benefits because his actions on the day of his termination did not amount to misconduct. (Dkt. No. 47.) This determination has no bearing on Sandia's discrimination claims as the issues are patently distinct. *See Hill v. Coca Cola Bottling Co.*, 786 F.2d 550, 553 (2d Cir. 1986) (holding that a plaintiff's discrimination claim is not precluded by a finding of misconduct by an unemployment insurance compensation board); *Cody v. Darden Rests.*, No. CV 12-0484, 2012 WL 6863922, at *5 (E.D.N.Y. Oct. 11, 2012). Other than sheer speculation, Sandia provides no other evidence to suggest that Wal-Mart's actions were motivated by discrimination. As such, Sandia has failed to demonstrate that his termination and Wal-Mart's other purported adverse action "occurred under circumstances giving rise to an inference of discrimination based on the plaintiff's membership in a protected class." *Hunter*, 843 F. Supp. 2d at 92 (internal quotation marks and citation

omitted).

**B.**     **Retaliation**

Wal-Mart first argues that Sandia has not engaged in protected activity because his internal complaints in no way relate to a claim of discrimination.  (Dkt. No. 43, Attach. 2 at 21.)  In any event, Wal-Mart maintains that Sandia did not suffer actionable retaliation because: (1) the temporal relationship between the complaint and his termination is too remote; and (2) work assignments, issued coachings, and personality conflicts are not cognizable retaliatory conduct.  (*Id.* at 22-24.)  Finally, Wal-Mart contends that Sandia fails to point to any evidence of retaliatory animus in the aggrieved of conduct.  (*Id.* at 23.)

Sandia counters that he engaged in protected activity because the March 2012 incident that he complained of was, in fact, motivated by discrimination.  (Dkt. No. 45 at 4.)  After he complained about his supervisor's conduct, Sandia asserts that Gaio "retaliate[d] and micromanaged" him "until [his] termination."  (*Id.* at 5.)  Without citing record support, Sandia argues that his job responsibilities increased, his hours were cut, and his pay was reduced.  (*Id.*)

In addition to barring unlawful employment discrimination, Title VII

prohibits an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). When evaluating retaliation claims, courts apply the burden-shifting framework established by *McDonnell Douglas*. *See* 411 U.S. 792; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). Accordingly, a plaintiff must first state a prima facie by showing that "he engaged in a protected activity, such as complaining about race discrimination, and that his employer took an adverse action in retaliation." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). The burden then shifts to an employer to offer a legitimate, non-retaliatory reason for its action. *See id.* Once an employer does so, the burden returns to the plaintiff to demonstrate "that the unlawful retaliation would not have occurred 'but-for' the [employer's] alleged wrongful actions." *Id.* at 227.

The court need go no further than the first step of the *McDonnell Douglas* framework because, again, Sandia fails to demonstrate a prima facie case. Sandia complained to the regional human resources director,

the marketing manager, and the store manager that Gaio and other associates humiliated him and mocked him in March 2012. (Dkt. No. 43, Attach. 6 at 94, 97.)  Specifically, at his deposition, Sandia testified to the following:

> Q. What did you tell [the store manager] exactly?
> A. I told him what I'm saying here.
> Q. That [Gaio] humiliated you in front of other associates?
> A. Yes.
> Q. And mocked you?
> A. Yes.
> Q. Did you tell him that was unfair?
> A. Yes.
> Q. Did you tell him why you thought it happened?
> A. I have no idea why he did that.

(*Id.* at 92-93.)  Yet, Sandia never complained about conduct prohibited by Title VII. *See* 42 U.S.C. §§ 2000e-3(a).  To qualify as protected activity, a plaintiff must "have had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotations marks and citations omitted).  Even if Sandia "might have believed that any bullying, regardless of whether it was motivated by impermissible discrimination, constituted a violation of Title VII . . . , a mere subjective good faith belief is insufficient." *Johnson v. City*

*Univ. of N.Y.*, 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014) (internal quotation marks and citations omitted).  Because Sandia fails to point to evidence that he, in fact, complained about misconduct that he objectively believed was unlawful discrimination, he did not engage in protected activity.  *See Kelly*, 716 F.3d at 16; *Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 134-35 (2d Cir. 1999).  Accordingly, Wal-Mart is entitled to summary judgment on this claim as well.

## C.    **Hostile Work Environment**

Wal-Mart asserts that the Sandia cannot meet the high standard required of a hostile work environment claim and that his allegations only amount to "boorish conduct."  (Dkt. No. 43, Attach. 2 at 5.)  Furthermore, Wal-Mart contends that such conduct was unconnected to any discrimination based on race or national origin.  (*Id.* at 6.)  Sandia opposes and relies almost solely on the March 2012 incident to support his claim.  (Dkt. No. 45 at 2, 4-5.)  Sandia also points to Gaio's micromanagement and personality conflicts with his supervisors and other associates as additional evidence of a hostile work environment.  (*Id.* at 5.)

Title VII prohibits an employer from discriminating in the "compensation, terms, conditions, or privileges of employment, because of

[an] individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). "The phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . , which includes requiring people to work in a discriminatorily hostile or abusive environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015). That said, "Title VII does not set forth a general civility code for the American workplace." *Redd v. N.Y.S. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (internal quotation marks and citation omitted).

To establish a hostile work environment claim, "'a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult" that would objectively "be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 320-21 (internal quotation marks and citations omitted). To "meet the threshold of severity or pervasiveness, incidents must be sufficiently continuous and concerted rather than episodic or isolated." *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 351 (N.D.N.Y. 2010) (internal quotation marks and citations omitted). Furthermore, the conduct must

alter the terms and conditions of a plaintiff's employment.  *Id.*

Here, where Sandia primarily alleges a single incident, the conduct must be "extraordinarily severe" to demonstrate a claim.  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (collecting cases).  In *Howley v. Town of Stratford*, for example, the plaintiff defeated summary judgment by showing that on a single instance a co-worker made obscene, sexist comments related to her ability to perform her job in a large public work forum where she was the only female and other men that were present were her subordinates.  *See* 217 F.3d 141, 154 (2d Cir. 2000).  In addition, the co-worker accused the plaintiff of only being selected as a lieutenant because she allegedly performed fellatio.  *See id.*  The Second Circuit found that this incident sufficiently altered the terms and conditions of the plaintiff's employment because such "gender-based skepticism" could "impair[] her ability to lead in life-threatening circumstances often faced by firefighters."  *Id.*  By contrast, it was not a hostile work environment where the plaintiff suffered a single physical assault by his supervisor, but remained at the same facility, "in the same position, at the same pay, and with the same responsibilities."  *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008).  The court reasoned that the assault "was not so severe as

to alter materially the plaintiff's working conditions . . . or an obscene and humiliating verbal tirade that undermines the victim's authority in the workplace." *Id.* (internal citations omitted).

The conduct here is clearly less severe than in *Mathirampuzha*, nevertheless, Sandia testified that he was humiliated. (Dkt. No. 43, Attach. 6 at 110-11.) However, like *Mathirampuzha,* Sandia's pay, position, and duties remained the same from the March 2012 incident up through his termination. (*Id.*) Accordingly, such conduct does not nearly approach the "extraordinarily severe" standard required for a single incident to form the basis of a hostile work environment claim. *See Alfano*, 294 F.3d at 374. Nor does the additional conduct that Sandia alleges — micromanagement by his supervisor and personality conflicts with co-workers — come close to the requisite level of objective severity or pervasiveness. For instance, Sandia testified that he never heard any derogatory or prejudicial comments about Asians, African Americans, or persons of Guyanese origin while at work and cannot otherwise connect conduct by his supervisors and co-workers with unlawful discrimination. (Dkt. No. 43, Attach. 6 at 112-13); *see Littlejohn*, 795 F.3d at 320-21. Accordingly, Wal-Mart is entitled to judgment on this claim.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Wal-Mart's motion for summary judgment (Dkt. No. 43) is **GRANTED**; and it is further

**ORDERED** that Sandia's amended complaint (Dkt. No. 6) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

August 18, 2016
Albany, New York

Gary L. Sharpe
U.S. District Judge